## 2014 UT App 282

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
JEFFERY FINLAYSON,
Defendant and Appellant.

Opinion
No. 20110906-CA
Filed November 28, 2014

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 101904639

Herschel Bullen, Attorney for Appellant

Sean D. Reyes and Ryan D. Tenney, Attorneys
for Appellee

SENIOR JUDGE PAMELA T. GREENWOOD authored this Opinion, in
which JUDGES JAMES Z. DAVIS and MICHELE M. CHRISTIANSEN
concurred.[1]

GREENWOOD, Senior Judge:

¶1     Jeffery Finlayson appeals from his convictions for
aggravated kidnapping, a first degree felony, Utah Code Ann. § 76-

---

1. The Honorable Pamela T. Greenwood, Senior Judge, sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

5-302 (LexisNexis Supp. 2013),[2] and aggravated assault, a third degree felony, *id*. § 76-5-103 (2012).[3] We affirm.


BACKGROUND

¶2    In early May 2010, Finlayson informed his wife (Wife) of eight months that he wanted a divorce.[4] On the evening of May 21, 2010, Wife had dinner with friends and returned to the couple's home around 10 p.m. At the time, Finlayson was doing repair work on the living room wall and buffing it with steel wool. One of the couple's dogs chewed on some of the steel wool Finlayson had left in the bedroom, and Finlayson reacted to the dog's behavior by hitting the dog. Wife told Finlayson to stop and put herself between Finlayson and the dog. When it appeared Finlayson would not hit the dog anymore, Wife moved to the doorway of the bedroom while still arguing with Finlayson. Finlayson then pushed

---

2. We cite the current version of the Utah Code where recent amendments do not materially affect our analysis.

3. Finlayson was also convicted of damage to a communication device, a class B misdemeanor. Utah Code Ann. § 76-6-108 (LexisNexis 2012). However, because Finlayson does not specifically address this conviction until his reply brief, and even then does not state why the evidence submitted by the State was insufficient to sustain his conviction on this charge, we decline to address it. *See Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903 ("It is well settled that issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." (citation and internal quotation marks omitted)).

4. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and we therefore recite the facts consistent with that standard. However, we present conflicting evidence to the extent necessary to clarify the issues raised on appeal." *State v. Davie*, 2011 UT App 380, ¶ 2 n.1, 264 P.3d 770 (citation and internal quotation marks omitted).

Wife, grasped her by the neck, and eventually pinned her down on the bed for ten to fifteen seconds. When Finlayson let her go, Wife retreated into the hallway.

¶3      As Wife walked down the hallway, Finlayson struck her in the back of the head with his fist. Finlayson delivered seven or eight punches to Wife's head while Wife crouched down and "tried to keep the blows off." The couple proceeded to wrestle on the floor, hitting, kicking, and yelling at each other. Wife warned Finlayson, "I'm going to call the police, I'm going to call your parole officer."[5] Finlayson responded to Wife's threat by stating, "[I]f I have to kill you, I'll do it." Finlayson then grabbed Wife around the neck with both hands and squeezed her throat for five or ten seconds. Finlayson let go, and then followed Wife into another room where Wife put her shoes on and prepared to leave the house. Wife again warned Finlayson that she would call the police. At this point, Finlayson grabbed Wife's mobile phone from her and blocked the doorway. Wife then threw a candle at Finlayson's head and struggled to exit the room.

¶4      After a couple minutes, Wife managed to escape and dashed to the front door of the house. However, Finlayson got there first and prevented Wife from opening the door. Wife told Finlayson, "You have to let me out. You need to let me go." Finlayson pleaded with Wife not to leave and not to tell anybody. Wife moved toward the back door, but Finlayson again moved faster and blocked Wife's exit. While standing at the top of the landing leading to the back door, Wife repeated her request that Finlayson let her go. Instead of letting Wife leave, Finlayson grabbed Wife by the shirt, pulled her down to the landing, and shoved her down a flight of ten to twelve stairs into the basement. Wife landed on her back at the bottom of the stairs.

¶5      Finlayson then went down the stairs and put both hands around Wife's neck, strangling her for ten to twenty seconds. As

---

5. At the time of these events, Finlayson was on parole for offenses unrelated to the charges involved in this appeal. *See generally State v. Finlayson*, 2000 UT 10, ¶ 1, 994 P.2d 1243.

Wife struggled to breathe, Finlayson stated, "I'm not going back to prison. If you have to die tonight I'll make that happen. I'm going to kill you tonight." While still holding her neck, Finlayson dragged Wife to her feet and said, "If you promise not to tell anybody I'll let you go." Finlayson ultimately loosened his grip around Wife's neck enough for Wife to say, "I promise." In response, Finlayson stopped choking Wife. Wife fell to the floor crying. For twenty minutes, Finlayson sat on her and talked about how he would "rather kill [himself] before [going] back to prison." Eventually, Finlayson went back up to the landing, made Wife reiterate her promise not to call the police, and agreed that he would leave the house. About a half hour later, Finlayson exited the house and left his set of house keys with Wife so that he could not reenter.

¶6     When Wife went upstairs, she found her cell phone and its battery "scattered." The house phone was not functioning either. A few hours later, Wife went to a friend's (Friend) house. The next day, Wife enlisted friends to help her move her belongings out of the house. Wife called the police around 8:30 p.m. that evening. When a responding officer (Officer) asked her to take him back to the couple's house that night, Wife refused, citing her fear of Finlayson.

¶7     In June 2010, Finlayson was charged with aggravated assault, damage to or interruption of a communication device, and unlawful detention. Following a preliminary hearing in August 2010, the trial court found probable cause on all three charges and bound Finlayson over for trial. In April 2011, the State moved to amend the information, seeking to dismiss the unlawful detention count and to add a new count for aggravated kidnapping. Finlayson did not file any opposition to the State's motion. At a subsequent scheduling conference, Finlayson's counsel addressed the State's amended information and stated, "Your Honor, we would ask—we have looked to try to find an objection. We believe it is in the State's right to do that. . . . And we would ask to have a new preliminary hearing so we can explore that—the probable cause on that issue." The trial court agreed, and at a subsequent

hearing, found probable cause to bind over Finlayson on all charges in the amended information.[6]

¶8 Before trial, Finlayson filed motions to exclude evidence of prior bad acts that led to his 1995 convictions, anticipating the State's notice of its intent to introduce evidence of Wife's statement that she would contact Finlayson's parole officer and of Finlayson's response that he "can't go back to prison" (the prior bad acts evidence). *See generally* Utah R. Evid. 404(b)(1), (b)(2) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character," but "[t]his evidence may be admissible for another purpose"). The State also moved to admit Finlayson's prior conviction for insurance fraud in the event that Finlayson chose to testify at trial.[7] The trial court granted the State's motion to admit the prior bad acts evidence but denied the motion to admit evidence of Finlayson's fraud conviction. Following the court's rulings, defense counsel requested a short recess to confer with Finlayson, explaining, "[T]here might be one other thing we want to address with the Court." When proceedings resumed, defense counsel introduced the subject of Finlayson's desire to waive a jury trial in the following exchange:

> [DEFENSE COUNSEL]: Judge, the final issue that has arisen is that based on—quite frankly, Mr. Finlayson has some concerns about a jury finding out that he was on parole, and we've explained just some of the procedural things with that; that the Court is opened to readdressing that situation. But . . . our legal advice to [Finlayson] has been that we, quite frankly, doubt we'll be able to find persuasive authority to

---

6. All three counts were charged as domestic violence crimes.

7. The State informed the court that it wanted to introduce evidence of Finlayson's prior convictions but that it did not intend to introduce the nature of Finlayson's other prior convictions (rape and sodomy) unless Finlayson opened the door to the specifics of his prior crimes.

give to the Court to—I've pled to the Court changing its decisions on that regard. But at this time, that Jeff Finlayson is desirous of waiving his right to a jury trial and would like to have Your Honor as the trier of fact in this matter. And I just talked to [the prosecutor] about this, and . . . as I've explained to Mr. Finlayson of the current state law—although I know it is on appeal right now with Utah Supreme Court,[8] the State does have to consent to such a waiver, and he has indicated that he would like 24 hours to think about it and decide whether (inaudible) or not.

THE COURT: That's fine.

[DEFENSE COUNSEL]: And I obviously think that's appropriate.

THE COURT: Okay. All right. Well, then keep me posted.

[DEFENSE COUNSEL]: Okay. What is the status? I know that the Court had mentioned yesterday about other judges hearing the trials. I can tell you right now that Mr. Finlayson's waiving the jury trial is predicated wholly on Your Honor hearing the evidence. And if another—one of the senior judges were to be assigned to the bench trial, I don't think he would want to waive the jury trial.

THE COURT: Okay.

[DEFENSE COUNSEL]: Is that correct?

[FINLAYSON]: That is correct.

. . . .

[FINLAYSON]: One last thing, if I may? I'd just like to put it into the record if it's all right, that I—although I respect Your Honor and I think—I trust that Your Honor would give me a very fair trial, and I appreciate that. The—I'd just like to get it into the record that this comes on the heels of my doubts

---

8. Defense counsel was most likely referring to *State v. Greenwood*, 2012 UT 48, 297 P.3d 556, that held that a defendant may not waive a jury trial without the State's consent. *Id.* ¶ 1.

that—with the [State's] 404(b) motion being granted,
that I would be able to get a fair jury trial just
because we're in the information age, and—
[DEFENSE COUNSEL]: I think that's a valid
argument.
[FINLAYSON]: Yeah.
[DEFENSE COUNSEL]: Okay. Thank you, Judge.
THE COURT: Yeah. It's always an issue of concern,
and we'll have jury instructions associated with that
information age issue.
[FINLAYSON]: Thank you, Your Honor.

The trial court's minute entry summarized these events, stating,
"Based on the rulings of the Court, the defendant discussed with
counsel that he waives his right to a jury trial and requests a bench
trial, [to] which the state has 24 hours to reply. This matter is still
set for a jury trial . . . ."[9] The State did not object to Finlayson's
request for a bench trial.

¶9      The trial court held a bench trial in September 2011. Wife
testified as to her recollection of the events of May 21, 2010. She
described the couple's initial confrontation in the bedroom and
their struggle in the hallway. Wife testified that although the fight
began as "a couple['s] argument," "things kind of shifted" when
Wife warned Finlayson that she would call his parole officer. The
argument then escalated beyond "an average fight" when
Finlayson put his hands around her neck and threatened to kill her.
Wife further testified about how Finlayson then foiled her attempts
to escape through the front and back doors, threw her down the
stairs, strangled her, and sat on top of her until she promised not
to report him to the police or his parole officer. Wife indicated that
she felt that she could not leave during the twenty minutes
Finlayson sat on her and during the half hour Finlayson prepared
to leave the house. According to Wife, the time period between the

---

9. At one point in the trial, when representing himself, *see infra*
¶ 14, Finlayson recounted his jury trial waiver and explained that
his desire for a bench trial was because of his fear that the jury
would be prejudiced against him by the prior bad acts evidence.

initial confrontation in the bedroom and the time when Finlayson finally left the house was "somewhat over an hour, maybe an hour 15, an hour 20." Wife also testified that following the altercation with Finlayson, she had scrapes and red marks on her neck, lumps on her head, a black eye, and bruises on her feet.

¶10　Friend also testified for the State. Friend recounted Wife's arrival at her home in the early morning hours of May 22, 2010. Friend described observing "swollen" and "large lumps on the back of [Wife's] skull and a big red mark on her neck." Officer testified as to the extent of Wife's injuries as well. Officer observed red marks and scratches on Wife's neck. At the close of the State's case-in-chief, Finlayson moved for a directed verdict on all three counts. The trial court denied the motion.

¶11　Finlayson testified in his own defense and offered a starkly different account of the events of May 21, 2010. Finlayson testified that as he was scolding the dog for chewing the steel wool and swatting the dog on its nose, Wife plowed into him. According to Finlayson, Wife pushed against the right side of his face and neck with her hands and pushed him over. When Finlayson stood up, Wife flailed her arms at Finlayson, attempting to strike him. Finlayson testified that he instinctively steered Wife away and onto the bed by holding her neck and that he managed to pin her down by the neck. After Finlayson said, "Don't do this," he let Wife go. Wife responded by yelling and swinging her arms at him again. Finlayson explained at trial that they were both yelling at each other and that Wife's punches came in "four or five rounds" of "more than 30" punches each until Wife paused to catch her breath. Although Wife hit him a few times, Finlayson blocked most of her "150 to 250" punches with his forearms and hands. Finlayson testified that Wife "wasn't able to hurt [him] . . . no matter how much she tried" and that he felt "an ego boost" because he "didn't feel threatened by her."

¶12　According to Finlayson, they then took each other down and wrestled on the floor. Finlayson was able to take control and pinned Wife to the floor by her neck for five seconds. He testified that he "just squeezed [Wife's neck] a little bit to get her attention."

Finlayson said, "Knock it off," and released Wife. The dispute then moved into another room, where Wife kicked and broke the laundry basket. Wife attacked Finlayson with a stick. Finlayson also testified that after he left and returned to the room, a floor length mirror had been smashed. Shortly thereafter, Wife "became very calm" and told Finlayson, "You're going back to prison buddy, I'm calling your parole officer." Finlayson then got down on his knees and pleaded with Wife not to call his parole officer. As Wife moved toward the front door, Finlayson moved backwards, crouched on his knees, and begged her not to report him. Once they reached the front door, Wife turned and started walking back to the kitchen. Finlayson caught up with her and eventually ended up kneeling on the landing in front of the back door. Finlayson testified that Wife then leaned over and whispered in his ear, "You're going back to prison." At this point, Finlayson "exploded," "screamed," and pushed Wife. As Finlayson pushed, Wife lurched backward and "went down the stairs."

¶13    Finlayson testified that as soon as he saw Wife going down the stairs, he "was frozen in horror" and "was worried that she was going to break her neck." Finlayson went to the bottom of the stairs, where Wife grabbed him around his knees. Finlayson and Wife wrestled with each other until they were in a position where Finlayson applied pressure against Wife's neck with his arm. After about ten seconds in this position, Wife said, "I give up." Finlayson and Wife both relaxed. According to Finlayson, Wife "just laid there on the carpet," and while he "was still on top of her," the couple proceeded to have a "heart-to-heart" conversation. During this conversation, Wife voluntarily promised that she would not call the police. After about six or seven minutes of talking, Finlayson went upstairs to collect his clothes and left the house fifteen minutes later.

¶14    On the second day of trial, Finlayson moved to dismiss his trial counsel. Finlayson indicated to the court that his trial counsel refused to ask questions that he believed were necessary to impeach Wife's testimony, stating, "I feel that those [questions] are important enough so that [the court] . . . can see who is telling the truth here because there are only two possibilities. Either I'm telling

the truth or [Wife] is . . . ." After confirming Finlayson's desire to represent himself, the trial court granted Finlayson's motion and appointed standby counsel. Finlayson proceeded to represent himself for the rest of the trial. In presenting his case, Finlayson called Wife back to the witness stand and examined her himself.

¶15    The trial court found Finlayson guilty as charged on all counts. In response to the verdict, Finlayson protested that the trial court "just simply said guilty" and did not give him "any reasons" for its decision. The trial court then explained that "[Wife's] actual testimony was credible without . . . any indication of a motive for her to lie" and "as a result of that . . . the facts have been established by the State" beyond a reasonable doubt. The trial court thereafter sentenced Finlayson to concurrent prison terms of six years to life for aggravated kidnapping and zero to five years for aggravated assault. The trial court also sentenced Finlayson to 180 days in jail, with credit for time previously served, for the misdemeanor offense. Finlayson timely appeals.

ISSUES AND STANDARDS OF REVIEW

¶16    As an initial matter, Finlayson requests that we remand this case to the trial court under rule 23B of the Utah Rules of Appellate Procedure to create a record regarding his claims of vindictive prosecution and ineffective assistance of counsel. *See* Utah R. App. P. 23B. "A remand under rule 23B will only be granted 'upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective.'" *State v. Lee*, 2014 UT App 4, ¶ 5, 318 P.3d 1164 (quoting Utah R. App. P. 23B(a)).

¶17    Finlayson also contends that the trial court erred in trying the case without a jury because Finlayson did not knowingly and intelligently waive his right to a jury trial. Because Finlayson failed to preserve this issue before the trial court, he argues that we should review his claim under the doctrine of plain error. "[T]o establish the existence of plain error and to obtain appellate relief from an alleged error that was not properly objected to," Finlayson

must show that "(i) [a]n error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for [him], or phrased differently, our confidence in the verdict is undermined." *See State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993). "If any one of these requirements is not met, plain error is not established." *Id.* at 1209.

¶18    Next, Finlayson argues that there is insufficient evidence to support his convictions for aggravated assault and aggravated kidnapping. "When reviewing a bench trial for sufficiency of the evidence, we must sustain the trial court's judgment unless it is against the clear weight of the evidence, or if [we] otherwise reach[] a definite and firm conviction that a mistake has been made." *Salt Lake City v. Maloch*, 2013 UT App 249, ¶ 2, 314 P.3d 1049 (alterations in original) (citation and internal quotation marks omitted). "In other words, we will only reverse if the trial court's findings were clearly erroneous." *Id*. (citation and internal quotation marks omitted).

¶19    Finlayson also argues that the trial court erred in failing to merge his conviction for aggravated kidnapping with his aggravated assault conviction. "Merger issues present questions of law, which we review for correctness." *State v. Diaz*, 2002 UT App 288, ¶ 10, 55 P.3d 1131.

¶20    Finally, Finlayson raises a constitutional challenge, arguing that the aggravated assault statute is unconstitutionally vague. Finlayson admits that this issue was not preserved but asserts that exceptional circumstances exist that permit this court to reach the merits of this issue. "[W]e reserve exceptional circumstances review for cases involving rare procedural anomalies . . . where our failure to consider an issue that was not properly preserved for appeal would . . . result[] in manifest injustice." *State v. Munguia*, 2011 UT 5, ¶ 22, 253 P.3d 1082 (omissions and second alteration in original) (citation and internal quotation marks omitted).

ANALYSIS

I. Rule 23B Motion

¶21     Finlayson requests that we remand this case to the trial court for an evidentiary hearing under rule 23B for the development of the record.[10] Specifically, he asserts that a remand is necessary to establish (A) his claim of vindictive prosecution and (B) his claim of ineffective assistance of counsel based on trial counsel's failure to realize that the prosecutor acted vindictively by amending the information to drop the unlawful detention charge and to add the aggravated kidnapping charge.

¶22     Rule 23B "was adopted to provide a procedural solution to the dilemma created by an inadequate record of trial counsel's ineffectiveness." *State v. Gunter*, 2013 UT App 140, ¶ 16, 304 P.3d 866 (citation and internal quotation marks omitted). As a result, rule 23B motions are "available only in limited circumstances, to supplement the record with known facts needed for an appellant to assert an ineffectiveness of counsel claim on direct appeal." *State v. Johnston*, 2000 UT App 290, ¶ 23, 13 P.3d 175 (per curiam). The rule provides,

> A party to an appeal in a criminal case may move the
> court to remand the case to the trial court for entry of
> findings of fact, necessary for the appellate court's

---

10. Finlayson and his appellate counsel filed separate 23B motions that raise different issues. "[A] criminal defendant may either file pro se motions if he or she has opted for self representation, *or* file motions through counsel if represented." *State v. Wareham*, 2006 UT App 327, ¶ 33, 143 P.3d 302 (emphasis added). Accordingly, a defendant "is not entitled to a 'hybrid representation.'" *Id*. "When a defendant is represented by counsel, he generally has no authority to file pro se motions, and the court should not consider them." *Id*. (citation and internal quotation marks omitted). Because Finlayson is represented by counsel on appeal, we do not consider the issues he raises in his pro se motion to remand. *See id.*

determination of a claim of ineffective assistance of counsel. The motion shall be available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective.

Utah R. App. P. 23B(a).

¶23    Finlayson's first claim for remand, based on vindictive prosecution, is beyond the scope of rule 23B. Finlayson requests a remand to establish "whether prosecutorial vindictiveness was the basis for the termination of all plea bargain discussion and the filing of an Amended Information." The plain language of rule 23B permits a remand only when "necessary for the appellate court's determination of a *claim of ineffective assistance of counsel*." *Id.* (emphasis added). Thus, rule 23B does not allow this court to remand the matter for findings of fact unrelated to a claim of ineffective assistance of counsel. Finlayson nevertheless argues that after he filed several pro se pretrial motions, the prosecutor became "very angry" and vindictively amended the information to charge him with a more serious crime. These allegations are purely speculative. *See Johnston*, 2000 UT App 290, ¶ 10 ("[T]he facts alleged in support of a Rule 23B motion may not be speculative."). Moreover, because the aggravated kidnapping charge was supported by the facts—as evidenced by the trial court's decision to bind Finlayson over for trial on the elevated charge—the prosecutor's decision to amend the information is not in itself indicative of an improper prosecutorial motive. We therefore deny Finlayson's rule 23B motion as to his claim for vindictive prosecution.[11]

---

11. We also observe that prosecutors routinely file additional or more serious charges when plea negotiations fail. As the United States Supreme Court has explained, "An initial [information]—from which the prosecutor embarks on a course of plea negotiation—does not necessarily define the extent of the

(continued...)

¶24 Finlayson's second request for a rule 23B remand, based on his claim of ineffective assistance of counsel, is also founded in speculation. He argues that his counsel was ineffective in failing to raise vindictive prosecution as a basis for seeking a dismissal. As this court has previously explained, a defendant "cannot meet his burden [under rule 23B] by merely pointing out what counsel did not do; he must bring forth the evidence that would have been available in the absence of counsel's deficient performance." *State v. Lee*, 2014 UT App 4, ¶ 12, 318 P.3d 1164. "Fact allegations are insufficient unless the defendant 'present[s] this court with the evidence he intends to present on remand and explain[s] how that evidence supports' an ineffective assistance of counsel claim." *State v. Curtis*, 2013 UT App 287, ¶ 18, 317 P.3d 968 (alterations in original) (quoting *Johnston*, 2000 UT App 290, ¶ 11). In other words, a rule 23B motion must be supported by affidavits that show how the nonspeculative allegation of facts "could support a determination that counsel's performance was deficient" and "demonstrate that the defendant suffered prejudice as a result." *Id.* ¶ 15; *see also Gunter*, 2013 UT App 140, ¶ 16. Furthermore, a defendant should identify witnesses who could testify at a rule 23B evidentiary hearing and "must ordinarily submit affidavits from the witnesses detailing their testimony." *Lee*, 2014 UT App 4, ¶ 11 (citation and internal quotation marks omitted).

¶25 In support of his rule 23B motion, Finlayson provided only his own affidavit and an affidavit from a private investigator who

---

11. (...continued)
legitimate interest in prosecution." *United States v. Goodwin*, 457 U.S. 368, 380 (1982). "For just as a prosecutor may forgo legitimate charges already brought in an effort to save the time and expense of trial, a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded." *Id.*; *see also* Utah R. Crim. P. 4(d) ("The court may permit an information to be amended at any time before trial has commenced so long as the substantial rights of the defendant are not prejudiced. If an additional or different offense is charged, the defendant has the right to a preliminary hearing on that offense . . . .").

assisted Finlayson's appellate counsel. However, these affidavits and Finlayson's motion for remand are "based largely upon hearsay and allegations reciting what [Finlayson] hopes the evidence will show and not on the required nonspeculative allegation of facts." *See Curtis*, 2013 UT App 287, ¶ 19 (citations and internal quotation marks omitted). In addition, Finlayson has not shown that trial counsel would have had any reason to pursue or file a motion to dismiss based on vindictive prosecution or that the trial court would have granted such a motion. Finlayson's rule 23B motion therefore is not properly supported by allegations that "if true, could support a determination that counsel was ineffective." *See* Utah R. App. P. 23B(a). Accordingly, we deny Finlayson's rule 23B motion because Finlayson has not met the requirements for remand on his ineffective assistance of counsel claim.

## II. Validity of Finlayson's Waiver of Trial by Jury

¶26    Finlayson argues that the trial court plainly erred in failing to ensure that he knowingly, voluntarily, and intelligently waived his right to a jury trial. Specifically, Finlayson contends that the trial court committed plain error in accepting his waiver of a jury trial without first engaging in a colloquy with him and that "[w]ithout such a discussion, his waiver could not be considered 'knowing and intelligent.'"

¶27    In Utah, "[a]ll felony cases shall be tried by jury unless the defendant waives a jury in open court with the approval of the court and the consent of the prosecution." Utah R. Crim. P. 17(c). "It is well settled that a defendant may waive his or her right to a jury trial if the waiver is knowingly, voluntarily, and intelligently made." *State v. Bhag Singh*, 2011 UT App 396, ¶ 13, 267 P.3d 281. "Courts must ensure that such waivers are knowing, voluntary, and intelligent." *State v. Hassan*, 2004 UT 99, ¶ 12, 108 P.3d 695. "We look to the totality of the circumstances to determine whether a defendant validly waived his right to a jury trial," *id*. ¶ 14, and we will not set aside a defendant's verdict following a bench trial "unless [the defendant] plainly shows that his waiver of a jury trial was not freely and intelligently made," *Bhag Singh*, 2011 UT App 396, ¶ 13.

¶28    The Utah Supreme Court encourages trial judges to conduct a colloquy with a defendant who wishes to waive his right to a jury trial. *Hassan*, 2004 UT 99, ¶ 18. Notwithstanding the advisability of engaging in a colloquy before granting a waiver, the supreme court has not mandated that trial judges conduct a colloquy or "mechanically recite any set of specific inquiries on occasions of jury waiver." *Id*. ¶ 19. Likewise, trial courts are "under no obligation to provide an exhaustive explanation of all the consequences of a jury waiver." *Id.* ¶ 17. As a result, under Utah law, "a defendant can validly waive a right to a jury trial even in the absence of a colloquy if other factors indicate that he knowingly, intelligently, and voluntarily waived the right." *Id.* ¶ 18.

¶29    Our decision in *State v. Bhag Singh*, 2011 UT App 396, 267 P.3d 281, is instructive. In that case, the defendant argued on appeal that the trial court plainly erred in failing to ensure that he knowingly, voluntarily, and intelligently waived his right to a jury trial both because no colloquy took place and because no interpreter was present when his trial counsel requested a bench trial. *Id*. ¶¶ 13–14. In considering his appeal, we recognized that neither a colloquy nor an interpreter is required for a jury waiver to be knowing, voluntary, and intelligent. *Id*. ¶ 14. And when we evaluated the totality of the circumstances, we were not persuaded that the defendant's waiver was not knowingly, voluntarily, and intelligently made because the defendant "had an interpreter while he consulted with his attorney about waiving his right to a jury trial and his attorney requested the bench trial in [the defendant's] presence." *Id*.[12] We therefore determined that the trial court did not plainly err. *Id*.

---

12. In *State v. Hassan*, 2004 UT 99, 108 P.3d 695, the Utah Supreme Court stated that "[a] colloquy is especially useful in ensuring the validity of a waiver when a defendant has limited comprehension of the English language or is unrepresented by counsel." *Id.* ¶ 18. Those circumstances are not present in this case, and we can infer that trial counsel discussed the waiver issue with Finlayson during the recess after the ruling on the prior bad acts evidence. *See infra* ¶ 30.

¶30 Similarly, in this case, we are not convinced that the trial court erred in granting Finlayson's waiver of his right to trial by jury. At a pretrial hearing, Finlayson's counsel requested and was granted a recess to speak with Finlayson shortly after the trial court ruled that Wife's statement about calling Finlayson's parole officer would be admitted at trial. Upon returning to open court, Finlayson was present as his trial counsel indicated to the court that "Finlayson has some concerns about a jury finding out that he was on parole" and is therefore "desirous of waiving his right to a jury trial and would like to have Your Honor as the trier of fact in this matter." Although the trial court did not thereafter conduct a colloquy with Finlayson, when trial counsel asked Finlayson to confirm that trial counsel accurately represented Finlayson's decision, Finlayson stated, "That is correct." Additionally, Finlayson addressed the court and volunteered that his waiver "comes on the heels of [his] doubts" that he could have a fair jury trial in light of the admission of the prior bad acts evidence. Given the totality of the circumstances, we conclude that "other factors indicate that [Finlayson] knowingly, intelligently, and voluntarily waived the right" to a jury trial "even in the absence of a colloquy." *See Hassan*, 2004 UT 99, ¶ 18.

¶31 We therefore determine that the trial court did not err in accepting Finlayson's request to waive a jury trial without first conducting a colloquy. Accordingly, Finlayson's claim of plain error fails because he cannot demonstrate that an error occurred.[13]

---

13. Finlayson also asserts that the trial court's failure to engage in a colloquy was a structural error that does not require a showing of prejudice. *See generally State v. Cruz*, 2005 UT 45, ¶ 17, 122 P.3d 543 (explaining that structural errors are "flaws in the framework within which the trial proceeds" and that "instead of requiring an aggrieved defendant to prove prejudice, as a plain error analysis requires, a structural error analysis presumes prejudice" (citations and internal quotation marks omitted)). However, because we have determined that the trial court did not err in accepting his jury trial waiver, *see supra* ¶¶ 30–31, Finlayson's structural error claim fails.

(continued...)

III. Sufficiency of the Evidence

¶32     Finlayson asserts that his aggravated assault and aggravated kidnapping convictions are not supported by sufficient evidence.[14] "When reviewing a bench trial for sufficiency of [the] evidence, we must sustain the trial court's judgment unless it is against the clear weight of the evidence, or . . . the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *Bhag Singh*, 2011 UT App 396, ¶ 5 (alteration and omission in original) (citation and internal quotation marks omitted). "Upon review, we accord deference to the trial court's ability and opportunity to evaluate credibility and demeanor." *State v. Davie*, 2011 UT App

---

13. (...continued)
*See Cruz*, 2005 UT 45, ¶ 18 (noting that the existence of error is the first prong in both plain error and structural error analyses).

14. Finlayson also complains that the trial court failed to make adequate findings in support of its verdict.

> [I]n cases in which factual issues are presented to and must be resolved by the trial court but no findings of fact appear in the record, we assume that the trier of facts found them in accord with its decision, and we affirm the decision if from the evidence it would be reasonable to find facts to support it.

*State v. Titus*, 2012 UT App 231, ¶ 16, 286 P.3d 941 (citation and internal quotation marks omitted). In this case, Finlayson objected to the verdict, stating that the trial court "just simply said guilty" and did not give him "any reasons" for its decision. In response, the trial court stated that although it did not need to give reasons for the guilty verdict, it found that "[Wife's] actual testimony was credible without . . . any indication of a motive for her to lie" and "as a result of that . . . the facts have been established by the State" beyond a reasonable doubt. Given these statements and the evidence presented at trial, "we are confident we can trace the steps by which the judge reached . . . [his] conclusions." *See id.* (omission in original) (citation and internal quotation marks omitted).

380, ¶ 18, 264 P.3d 770 (citation and internal quotation marks omitted). "[B]ecause the trial court had the opportunity to view these witnesses and weigh their credibility, we defer to its findings unless the record demonstrates clear error." *Id.* (alteration in original) (citation and internal quotation marks omitted).

A.    Aggravated Assault

¶33    Finlayson contends that there is insufficient evidence to support his conviction for aggravated assault. "A person commits aggravated assault if the person commits assault . . . and uses . . . a dangerous weapon . . . or . . . other means or force likely to produce death or serious bodily injury." Utah Code Ann. § 76-5-103(1) (LexisNexis 2012).[15] An "assault" is

> (a) an attempt, with unlawful force or violence, to do bodily injury to another; (b) a threat, accompanied by a show of immediate force or violence, to do bodily injury to another; or (c) an act, committed with unlawful force or violence, that causes bodily injury to another or creates a substantial risk of bodily injury to another.

*Id.* § 76-5-102(1). To establish that a person used force likely to produce "serious bodily injury" as required by the Utah Code, *see id.* § 76-5-103(1)(b), the evidence must show that the force used was likely to cause "bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial

---

15. After the time Finlayson committed the offenses, the aggravated assault statute was amended, deleting the variant of aggravated assault where the actor "intentionally causes serious bodily injury to another." Utah Code Ann. § 76-5-103(1)(a) (LexisNexis 2009). *Compare id.*, *with id.* § 76-5-103(1) (2012). Because this case involves the unrevised variant where the actor "uses a dangerous weapon . . . or other means or force likely to produce death or serious bodily injury," the amendments are not relevant here.

risk of death," *id.* § 76-1-601(11). Under the State's theory of the case, and as argued to the trial court, Finlayson assaulted Wife with "other means or force likely to produce death or serious bodily injury" when he forcefully threw Wife down the stairs. *See id.* § 76-5-103(1)(b).

¶34    On appeal, Finlayson does not contest that the evidence was sufficient to show that he committed an assault and that he used force sufficient to cause Wife bodily injury. However, he asserts that because the State failed to present any expert, forensic, or competent evidence that the amount of force he used actually caused serious bodily injury, the evidence is insufficient to prove that he committed an aggravated assault. In Finlayson's view, the injuries Wife sustained amounted to "only trivial bodily injury." *See id*. § 76-1-601(3) ("'Bodily injury' means physical pain, illness, or any impairment of physical condition.").

¶35    Contrary to Finlayson's assertion, "the State was not required to establish that [Wife] actually suffered 'serious bodily injury'" in order to prove aggravated assault. *See State v. Ekstrom*, 2013 UT App 271, ¶ 12, 316 P.3d 435 (collecting cases). Rather, the State only had to show that Finlayson "use[d] . . . means or force *likely* to produce death or serious bodily injury." *See* Utah Code Ann. § 76-5-103(1)(b) (emphasis added). Here, the evidence was sufficient to support such a conclusion. Finlayson and Wife both testified that he forced Wife down a flight of stairs. Based on this undisputed testimony, the trial court could readily conclude that the degree of force Finlayson used was likely to cause "bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death." *Id.* § 76-1-601(11); *cf. Whitney v. Division of Juvenile Justice Servs.*, 2012 UT 12, ¶¶ 5–6, 274 P.3d 906 (addressing a certified question in a negligence suit that stemmed from a juvenile's death resulting from injuries sustained from a fall down a flight of stairs); *Benally v. Robinson*, 376 P.2d 388, 389 (Utah 1962) (considering an appeal in a wrongful death action that resulted from the decedent's fall down a flight of stairs); *State v. Tuckett*, 2000 UT App 295, ¶¶ 1, 3, 13 P.3d 1060 (affirming a conviction of homicide by assault where the

defendant pushed the victim down a flight of stairs and the victim died from the impact on the concrete floor). Indeed, Finlayson himself testified that as he watched Wife falling down the stairs, he "was frozen in horror" and "worried that she was going to break her neck." Notwithstanding the fact that Wife suffered only cuts and bruises from the fall, Finlayson's act of pushing Wife down the flight of stairs is sufficient to establish that Finlayson used force likely to produce death or serious bodily injury.

¶36    We conclude that there is sufficient evidence in the record to support a finding that Finlayson committed an aggravated assault when he pushed Wife down the stairs. Accordingly, we affirm Finlayson's conviction for aggravated assault.

B.    Aggravated Kidnapping

¶37    Finlayson next argues that the evidence is insufficient to support a conviction for aggravated kidnapping and that the evidence would support, at most, a conviction for unlawful detention. According to Finlayson, the sequence of events on the night of May 21, 2010 was merely "mutual combat," was "relatively trivial conduct," and "is not the stuff of aggravated kidnapping." We do not agree.

¶38    The State's theory of aggravated kidnapping in this case required it to prove that Finlayson, "in the course of committing unlawful detention or kidnapping . . . act[ed] with intent . . . to hinder or delay the discovery of or reporting of a felony" or "to inflict bodily injury on or to terrorize the victim or another." *See* Utah Code Ann. § 76-5-302(1)(b)(iii), (iv) (LexisNexis Supp. 2013). An unlawful detention occurs when "the actor intentionally or knowingly, without authority of law, and against the will of the victim, detains or restrains the victim," *id*. § 76-5-304(1) (2012), whereas a kidnapping occurs when "the actor intentionally or knowingly, without authority of law, and against the will of the victim[,] . . . detains or restrains the victim for any substantial period of time" or "detains or restrains the victim in circumstances exposing the victim to risk of bodily injury," *id*. § 76-5-301(1)(a), (b). Because aggravated kidnapping is committed "in the course of

committing unlawful detention or kidnapping," the State was not required to show that Finlayson detained Wife for a substantial period of time, provided that the State presented sufficient evidence that Finlayson acted with intent to hinder or delay the discovery or reporting of a felony, or with the intent to inflict bodily injury on or to terrorize the victim. *See id*. § 76-5-302(1) (Supp. 2013); *see also State v. Mecham*, 2000 UT App 247, ¶ 31 n.10, 9 P.3d 777 ("[T]here is no 'substantial period' requirement in Utah's aggravated kidnaping statute, unlike Utah's simple kidnaping statute.").

¶39    As to Finlayson's intent to hinder the reporting of a felony, the State proceeded on the theory that the underlying felony was either aggravated assault or witness tampering. For an aggravated assault to have occurred, as discussed *supra* ¶ 33, the State was required to show that Finlayson committed an assault and, in so doing, used "a dangerous weapon . . . or . . . other means or force likely to produce death or serious bodily injury." Utah Code Ann. § 76-5-103(1)(b) (LexisNexis 2012). And for witness tampering to have occurred, the State was required to show that Finlayson, "believing that an official proceeding or investigation is pending or about to be instituted, or with the intent to prevent an official proceeding or investigation, . . . attempt[ed] to induce or otherwise cause another person to . . . testify or inform falsely; [or] . . . withhold any testimony, information, document or item." *See id.* § 76-8-508(1)(a), (b).

¶40    The evidence is sufficient to show that Finlayson restrained Wife with the intent to hinder or delay the discovery or reporting of a felony—whether the underlying felony is viewed as assault or witness tampering, either one supports Finlayson's conviction for aggravated kidnapping. First, the State presented sufficient evidence that Finlayson acted with the intent to hinder or delay the reporting of an aggravated assault. We have already determined that there is sufficient evidence that Finlayson committed an aggravated assault when he pushed Wife down the flight of stairs. *See supra* ¶¶ 33–36. Finlayson's intent to hinder the reporting of this felony is established by Wife's testimony that after she landed at the bottom of the stairs, Finlayson strangled her while threatening

to kill her and telling her, "If you promise not to tell anybody I'll let you go." Wife also testified that after she made that promise, Finlayson sat on her, preventing her from leaving, and reiterated that he could not go back to prison. This evidence is sufficient to support a finding that Finlayson restrained Wife against her will with the intent to prevent her from reporting an aggravated assault.

¶41    Second, the State presented sufficient evidence that Finlayson acted with the intent to hinder or delay the reporting of witness tampering. Finlayson does not dispute that at the time of these events, he was on parole for crimes he had committed sometime earlier. Wife testified that as they were wrestling on the floor, she told Finlayson, "I'm going to call the police, I'm going to call your parole officer." Wife indicated that at this point, "things kind of shifted" and led to Finlayson strangling her, threatening to kill her, taking her phone, and blocking her when she attempted to escape. This evidence is sufficient to show that Finlayson acted "with the intent to prevent an official proceeding or investigation" and "attempt[ed] to induce or otherwise cause [Wife] to . . . withhold . . . information" from the police and his parole officer.[16] *See* Utah Code Ann. § 76-8-508(1)(b). As with the aggravated assault, Wife's testimony that Finlayson restrained her at the bottom of the stairs and would not let her go until she promised not to report him to authorities is sufficient to sustain a finding that Finlayson detained Wife with intent to prevent her from reporting the crime of witness tampering.

¶42    The evidence is also sufficient to support Finlayson's conviction under the other variants of aggravated kidnapping, i.e., based on Finlayson's intent to inflict bodily injury on or to terrorize Wife. First, the State introduced sufficient evidence that Finlayson

---

16. We are also not persuaded by Finlayson's argument that his "only intent . . . was to *temporarily* not let [Wife] call his parole officer." (Emphasis added.) And Wife's later reporting of Finlayson's conduct does not defeat a finding that Finlayson acted with the intent to hinder or delay the reporting or discovery of a felony.

acted with intent to inflict bodily injury, i.e., intent to inflict "physical pain, illness, or any impairment of physical condition." *See* Utah Code Ann. § 76-1-601(3) (LexisNexis 2012). Wife testified that Finlayson hit and strangled her, prevented her from exiting through the front and back doors of the home, shoved her down the stairs, and sat on her. This testimony is sufficient to support a finding that Finlayson detained her against her will while acting with the intent to inflict bodily injury.

¶43    Second, the State introduced sufficient evidence that Finlayson acted with intent to terrorize Wife. Although "terrorize" is not specifically defined in the aggravated kidnapping statute, another section of the criminal code defines "[i]ntimidate or terrorize" as "an act which causes the person to fear for his physical safety or damages the property of that person or another." Utah Code Ann. § 76-3-203.3(3) (LexisNexis 2012) (setting forth the penalty for hate crimes). The word "terrorize" also means "to cause (someone) to be extremely afraid" or "to force (someone) to do something by using threats or violence." Merriam-Webster.com, http://www.merriam-webster.com/dictionary/terrorize (last visited Oct. 20, 2014); *see also State v. Bagnes*, 2014 UT 4, ¶ 14, 322 P.3d 719 ("A starting point for our assessment of ordinary meaning is the dictionary.").

¶44    Based on these definitions, Wife's testimony that Finlayson threatened her life while keeping her from leaving the home is sufficient to establish that Finlayson acted with intent to cause her to be "extremely afraid." Moreover, Wife testified that while making threats and strangling her, Finlayson pressured Wife into promising not to call his parole officer. This testimony also sufficiently supports a finding that Finlayson detained Wife against her will while acting with the intent to terrorize Wife.

¶45    In summary, there is sufficient evidence to sustain Finlayson's conviction for aggravated kidnapping under several variants of the crime. We therefore conclude that the State presented sufficient evidence at trial to support the trial court's findings that Finlayson committed both aggravated assault and

aggravated kidnapping.[17] We now turn to the question of whether these convictions should have been merged.

## IV. Merger

¶46 Finlayson argues that the trial court erred in refusing to merge his convictions for aggravated kidnapping and aggravated assault. Finlayson asserts that the detention was incidental to and indistinguishable from the kidnapping and that the aggravated kidnapping charge "should therefore have been merged into the aggravated assault." In response, the State argues that merger does

---

17. Finlayson also argues that his conduct was trivial and therefore "the maxim de minimis non curat lex should . . . be employed in the instant matter." "De minimis non curat lex" stands for the proposition that "[t]he law does not concern itself with trifles." *Black's Law Dictionary* 496 (9th ed. 2009). Finlayson has not identified in the record where he preserved this argument, *see* Utah R. App. P. 24(a)(5)(A) (requiring the appellant to provide a "citation to the record showing that the issue was preserved in the trial court"), and we have not ascertained from our own review of the record that the trial court was ever presented with or considered the doctrine of de minimis non curat lex, *see State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867 ("Utah courts require specific objections in order to bring all claimed errors to the trial court's attention to give the court an opportunity to correct the errors if appropriate." (citation and internal quotation marks omitted)). "Where there is no clear or specific objection and the specific ground for objection is not clear from the context[,] the theory cannot be raised on appeal." *Id.* (alteration in original) (citation and internal quotation marks omitted). Because Finlayson did not bring the de minimis non curat lex argument to the trial court's attention, he has not preserved the issue for appeal. Regardless, given our conclusions that the evidence is sufficient to support Finlayson's convictions for aggravated kidnapping and aggravated assault, *see supra* ¶¶ 35–36, 40–45, we could hardly conclude that his conduct was merely trivial.

not apply here because the aggravated kidnapping was not done to facilitate the aggravated assault.[18]

¶47    "Courts apply the merger doctrine as one means of alleviating the concern of double jeopardy that a defendant should

---

18. The State also argues that merger does not apply because the aggravated assault did not involve any period of detention. The State argues that "merger applies only to the very narrow category of cases in which, in addition to kidnapping, the defendant is convicted of another crime that involves a 'necessary' or 'inherent' period of detention." (Citing *State v. Finlayson*, 2000 UT 10, ¶ 19, 994 P.2d 1243.) We, however, analyze merger in a larger context here because the Utah Supreme Court has indicated that "a proper merger analysis requires consideration of both [the lesser included offense statute]" and the three factors set forth in *State v. Finlayson*, 2000 UT 10, 994 P.2d 1243. *State v. Lee*, 2006 UT 5, ¶ 32, 128 P.3d 1179; *see also* Utah Code Ann. § 76-1-402(3) (LexisNexis 2012) ("An offense is . . . included when: (a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or (b) It constitutes an attempt, solicitation, conspiracy, or form of preparation to commit the offense charged or an offense otherwise included therein; or (c) It is specifically designated by a statute as a lesser included offense."). "If one conviction is a lesser included offense of another conviction under section 76-1-402, the convictions merge. If not, the *Finlayson* factors must be assessed to determine whether merger is appropriate." *Lee*, 2006 UT 5, ¶ 32; *see also State v. Lopez*, 2001 UT App 123, ¶¶ 12–16, 24 P.3d 993 (applying the *Finlayson* factors to an aggravated kidnapping and aggravated assault case). *But see State v. Pierson*, 2000 UT App 274, ¶ 20, 12 P.3d 103 (applying the *Finlayson* factors and concluding that because "the crime of aggravated burglary can be completed upon entry of the building, and detention is inherent in neither the definition of aggravated burglary nor under the facts of this case," the burglary and kidnapping convictions did not merge). In *Lee*, a case involving charges similar to the ones in this case, our supreme court held that "aggravated kidnaping is not a lesser included offense of aggravated assault under section 76-1-402." 2006 UT 5, ¶ 33.

not be punished twice for the same crime." *State v. Lopez*, 2004 UT App 410, ¶ 8, 103 P.3d 153. "Merger is most commonly applied to situations involving a defendant who has been charged with committing both a violent crime, in which a detention is inherent, and the crime of kidnaping based solely on the detention necessary to the commission of the companion crime." *State v. Diaz*, 2002 UT App 288, ¶ 17, 55 P.3d 1131. "'[W]hen a kidnaping occurs under circumstances involving a charged companion criminal activity'—such as aggravated assault—if the 'kidnaping was not "merely incidental or subsidiary to [the companion] crime,"' separate convictions can be supported." *State v. Garrido*, 2013 UT App 245, ¶ 34, 314 P.3d 1014 (second alteration in original) (quoting *Diaz*, 2002 UT App 288, ¶ 19).

¶48    Utah courts have utilized a three-part test to determine if kidnapping merges with another crime:

> [I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnaping the resulting movement or confinement:
>
> (a) Must not be slight, inconsequential and merely incidental to the other crime;
>
> (b) Must not be of the kind inherent in the nature of the other crime; and
>
> (c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.[19]

---

19. The *Finlayson* analytic framework applies even when a defendant is charged under different permutations of aggravated kidnaping. *See State v. Lopez*, 2001 UT App 123, ¶ 12 n.3, 24 P.3d 993. In other words, the *Finlayson* test applies whether the defendant acted with intent to facilitate the commission of a felony, to hinder or delay the reporting of a felony, or to inflict bodily injury on or to terrorize the victim. *See* Utah Code Ann. § 76-5-302(1) (LexisNexis Supp. 2013).

*State v. Finlayson*, 2000 UT 10, ¶ 23, 994 P.2d 1243 (first alteration in original) (citation and internal quotation marks omitted). "[T]he third prong . . . contains the qualification that the kidnaping must make the other crime substantially easier of commission or substantially lessen[] the risk of detection." *State v. Lopez*, 2001 UT App 123, ¶ 16, 24 P.3d 993 (second alteration in original) (citation and internal quotation marks omitted). However, we have previously explained that "these are not necessarily words of limitation because there may be instances . . . in which the kidnaping and the 'other crime' are virtually independent of one another." *Id.* "In such instances, it is irrelevant whether or not the kidnaping made the other crime substantially easier of commission or substantially lessen[ed] the risk of detection because the facts had independent significance sufficient to support a separate conviction for aggravated kidnaping." *Id.* (citation and internal quotation marks omitted). "Should the State fail to demonstrate any one of [the *Finlayson*] elements, the detention must then be considered incidental to the companion crime, and the detention will merge into the companion crime." *Diaz*, 2002 UT App 288, ¶ 22.

¶49    This court's decision in *State v. Lopez*, 2001 UT App 123, 24 P.3d 993, illustrates the application of the *Finlayson* test when a defendant argues that an aggravated kidnapping charge should merge with a conviction for aggravated assault. *See id.* ¶¶ 12–16. In *Lopez*, the defendant broke into the victim's apartment, placed a knife to the victim's throat, and dragged her out of the apartment. *Id.* ¶ 6. From there, the defendant placed the victim in a headlock and dragged her down the stairs and to a parking lot. *Id.* ¶ 7. As the defendant tried to force the victim into his car, he stabbed the victim repeatedly until the defendant was restrained by neighbors. *Id.* A jury convicted the defendant of aggravated kidnapping and aggravated assault, and the defendant argued on appeal that the trial court should have merged his convictions. *Id.* ¶¶ 8–9.

¶50    In applying the *Finlayson* test to that case, this court first concluded that the defendant's movement of the victim "was neither inconsequential nor incidental to the assault." *Id.* ¶ 13. This court did not regard the defendant's confinement and movement

of the victim as inconsequential, because he "placed [the victim] in a headlock and dragged her down a flight of stairs, around the apartment building, and down a sidewalk . . . [and then he] tried to force [the victim] into his truck." *Id*. This court was also not persuaded that the defendant's detention and movement of the victim were incidental to the aggravated assault because the defendant "could have stabbed [the victim] at any point after he grabbed the knife without confining or moving her." *Id*. Second, and for the same reasons, this court determined that the defendant's movement and confinement of the victim were not inherent in the aggravated assault. *Id*. ¶ 14. Third, this court concluded that "the confinement and movement had significance independent of the aggravated assault," pointing to the defendant's movement of the victim "away from the site of the initial disturbance to the . . . parking area" and his attempt to put the victim in his truck. *Id*. ¶ 15. As we explained, because the defendant "did not need to do any of these acts to assault [the victim] with a knife," the defendant's confinement and movement of the victim had significance independent of the stabbing. *Id*. We therefore affirmed the trial court's refusal to merge the defendant's aggravated kidnapping and aggravated assault convictions. *Id*. ¶ 20.

¶51 Applying the *Finlayson* test to the facts of this case, we are not persuaded that the trial court erred in failing to merge Finlayson's conviction for aggravated kidnapping and his conviction for aggravated assault. As to the first prong, we are not convinced that Finlayson's confinement of Wife was slight, inconsequential, and merely incidental to the aggravated assault. Finlayson's detention of Wife was not inconsequential, because he kept Wife from leaving the home through the front and back doors and he restrained her by sitting on top of her. Nor was the detention incidental to the aggravated assault, because Finlayson could have pushed Wife down the stairs without thereafter sitting on her. Moreover, Finlayson did not hold Wife against her will for only so long as necessary to complete the aggravated assault of throwing her down the stairs. *See Garrido*, 2013 UT App 245, ¶ 34 (noting that the defendant's holding the victim against her will all night long was "not merely incidental to the aggravated assault"

because he did not just hold the victim as long as was necessary to complete the aggravated assault).

¶52 As to the second prong, we do not agree with Finlayson that his detention of Wife was "merely a component" of or inherent in the nature of the aggravated assault. Rather, Finlayson could have thrown Wife down the stairs without the type of confinement that took place. And as to the third prong, the detention involved here had significance independent of the aggravated assault because Finlayson did not need to prevent Wife from leaving the house for nearly an hour in order to complete the act of hurling her down the stairs.

¶53 We conclude that Finlayson's confinement of Wife was not slight, inconsequential, and merely incidental to the aggravated assault, that it was not inherent in the nature of the aggravated assault, and that it had independent significance. We therefore affirm the trial court's refusal to merge Finlayson's separate convictions for aggravated kidnapping and aggravated assault.

## V. Constitutional Challenge

¶54 Finally, Finlayson raises a challenge to the aggravated assault statute, arguing that it is unconstitutionally vague because it "lack[s] objective criteria to delineate among the . . . possible degrees of injury." Because Finlayson did not preserve this issue for appeal, he relies on the exceptional circumstances exception to the preservation rule.

¶55 The "'preservation rule applies to every claim, including constitutional questions, unless a defendant can demonstrate that "exceptional circumstances" exist or "plain error" occurred.'" *State v. Pullman*, 2013 UT App 168, ¶ 6, 306 P.3d 827 (quoting *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346). "The exceptional circumstances exception is ill-defined . . . and applies primarily to rare procedural anomalies." *Id.* ¶ 27 (omission in original) (citation and internal quotation marks omitted). According to Finlayson, he had "no genuine opportunity" to raise his constitutional argument due to his own self-representation and the involvement of trial counsel and standby counsel, and he contends that this "chaos of

the back and forth of counsel" presents exceptional circumstances. However, Finlayson does not explain how this situation is exceptional, rare, or anomalous, and he does not cite any case law analyzing the exceptional circumstances exception and its parameters. *See id.* Accordingly, Finlayson has not persuaded us that exceptional circumstances exist that would justify our review of this constitutional issue.[20]

## CONCLUSION

¶56 We deny Finlayson's motion to remand because Finlayson has not met the requirements for remand under rule 23B of the Utah Rules of Appellate Procedure. We conclude that the trial court did not plainly err in accepting Finlayson's waiver of his right to a jury trial. We also conclude that the evidence is sufficient to support Finlayson's convictions for both aggravated kidnapping and aggravated assault and that the trial court did not err in failing to merge the two convictions. Finally, exceptional circumstances that would permit our consideration of Finlayson's constitutional argument concerning the aggravated assault statute are not present. We therefore affirm.

———————

20. In making his constitutional argument, Finlayson also cites the elements of plain error. *See State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993) (explaining that the doctrine of plain error requires an appellant to show that an error exists, that the error should have been obvious to the trial court, and that the error is harmful). However, given that the criminal code defines "bodily injury," "serious bodily injury," and "substantial bodily injury" with specificity, *see* Utah Code Ann. § 76-1-601(3), (11), (12) (LexisNexis 2012), we cannot say that the trial court committed any obvious error in interpreting the aggravated assault statute, *see State v. Dean*, 2004 UT 63, ¶ 16, 95 P.3d 276 (stating that to demonstrate obvious error, an appellant "must show that the law governing the error was clear at the time the alleged error was made").